UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT

---

RAYMOND WALLACE,
          Petitioner, Pro se,

13 CV 3989

AFFIDAVIT

Index No.: _____

-against-

STATE OF NEW YORK,
          Respondent.

---

State of New York )
County of Clinton ) ss.:

I, Raymond Wallace, being duly sworn, deposes and says:

1.     I am the petitioner in the above-captioned matter, proceeding pro se.

2.     I make this Affidavit and attached Memorandum of Law in support of an Application for:

    A.     <u>An Order</u>: granting my request for a Writ of Habeas Corpus, on the grounds that the state court's resolution of my federal claims were not only contrary to or an unreasonable application of clearly defined Supreme Court precedent, but it was an unreasonable determination of the facts (see 28 U.S.C. 2254), and

1

      B.    <u>An Order</u>: granting a stay and abeyance so that I could go back to the state court and execute two post conviction applications which will establish not only that there were several errors on the part of the trial court, the prosecutor, and my appellate counsel which deprived me of several constitutional rights, but that I am actually innocent of at least two of the counts of the indictment upon which I was convicted.

3.    No other application for the relief requested herein has been made.

          I.    Procedural History

A.    My Voluntary Extradition From Indiana

4.    About 8 months into a 35 year sentence I was serving in Indiana for a drug offense[1], a Westchester County grand jury indicted me for several Penal Law offenses. As a result of said indictment, a warrant and detainer was issued by New York authorities.

5.    On or about 02/06/98, Indiana authorities informed me about the detainer issued by New York State officials. I voluntarily executed a waiver so that I may be sent back to New York State to face trial. On information and belief, I also requested a speedy trial under the provisions of the Interstate Compact on detainers.

---

[1] Class A Felony: Dealing in Cocaine (Nat Code 180104) IC – 35 – 48 – 41-

6. About 46 days later, I was transferred to New York State to stand trial in Westchester County. I was assigned an attorney from Westchester County's Assigned Counsel Program.

B. The Westchester County Proceedings

7. I was indicted by Westchester County indictment number 97-00765 and charged with the crimes of attempted murder in the first degree (2 counts), aggravated assault on a police officer, assault in the first degree, robbery in the first degree (12 counts), attempted robbery in the first degree (2 counts), robbery in the second degree (6 counts), attempted robbery in the second degree, criminal possession of a weapon in the second degree and criminal use of a firearm in the first degree (2 counts).

8. By decision and order dated October 7, 1997, the Hon. James Cowhey ordered a Huntley/Dunaway hearing for Lamont Devorce. Judge Cowhey denied the motion to suppress physical evidence on the ground that the factual allegations in the motion were insufficient as a matter of law. By decision and order dated June 3, 1998, the court ordered a Huntley/Dunaway hearing on the motion of my assigned trial counsel to suppress physical evidence. The motion was denied for the reason that the allegations were insufficient as a matter of law.

9. Hearings were held on four different dates wherein New Rochelle Police Officer John Hogan, Pelham Manor Police Officer Scott Carpenter, Pelham Manor

Sergeant Alfred Mosiello, Detective Dennis Zack, of the Westchester County Department of Public Safety, Mount Vernon Detectives Roger Bock and Lorenzo Grippo, Parole Officer Dennis Fernandez and Sergeant Laurie Carman of the Corrections Department, all testified.

10. Between 06/26/98 and 07/30/98 I was tried before the Hon. Barbara G. Zambelli, J.

11. Following the trial, I was found guilty of the crime of aggravated assault on a police officer (count 2), the crime of attempted murder on a police officer in the first degree (count 3), the crime of criminal possession of a weapon in the second degree (count 4), the crime of assault in the first degree (count 8), the crime of robbery in the first degree (counts 9-14 and 16-21), the crime of attempted robbery in the first degree (count 15), and the crime of attempted robbery in the first degree (count 22).

12. On September 15, 1998, I was sentenced, as a second felony offender, to the following terms of incarceration: a determinate term of imprisonment of twenty five years for the crime of aggravated assault on a police officer (count 2); an indeterminate term of imprisonment of twenty five years to life for the crime of attempted murder in the first degree (count 3), to run consecutively to count 2; a determinate term of imprisonment of fifteen years for the crime of criminal possession of a weapon in the second degree (count 4); a determinate term of imprisonment of fifteen years for the crime of assault in the first degree (count 8); a determinate term of imprisonment of

twenty five years for the crime of robbery in the first degree (counts 9-14); a determinate term of imprisonment of fifteen years for the crime of attempted robbery in the first degree (counts 16-21) to run consecutively to one another; and a determinate term of imprisonment of fifteen years for the crime of attempted robbery in the first degree (count 22) to run concurrently with counts 16-21. A one hundred fifty-five dollar mandatory surcharge was imposed.

13.     On or about September 25, 1998, my assigned trial counsel filed a notice of appeal from my judgment of conviction.

C.      Post Conviction Request To Remain In New York State For Appellate And Post Conviction Proceedings

14.     After I was convicted in Westchester County I immediately became concerned about my appeal and other post conviction applications which I knew I had to file prior to filing a habeas application. This concern grew out of the fact that while I was waiting to be transferred from Indiana to New York, I discovered that the Indiana Correctional Facility where I was housed did not have any annotated statutes, encyclopedias or treatises which would help me understand New York State's unique procedural protocols relative to CPL Article 440 motions and supplemental pro se briefs.

15.     On information and belief, prior to being transferred back to Indiana, I informed my attorney about this and requested that I be allowed to stay in New York

until my direct appeal and post conviction applications were completed. On information and belief, I was informed by my assigned attorney that this was out of his hands.

16. Unfortunately, within a week after I was sentenced, I was transferred back to Indiana.

D. The Troubles With My Assigned Appellate Counsel, Indiana's Deficient Law Library, And Lack Of Access To Assistance In Helping File Post Conviction Motion

17. As mentioned above, the Indiana correctional facility where I was housed did not have any annotated statutes, encyclopedias or treatises specific to the unique protocols of New York State jurisprudence for putting together Article 440 motions, other post conviction applications, or pro se supplemental briefs. Nor did they have trained personnel to assist me in putting these applications together.

18. This would eventually prove prejudicial because the lawyer who was assigned to represent me on appeal, Mr. Michael G. Paul, kept me in the dark about almost everything that was going on. As a result, he and I started to bump heads. He simply failed to comply with the most basic courtesies between a lawyer and his client (see e.g. 22 NYCRR 1210.1).

19. For instance, he would not accept my calls. He would not return my family members' calls. He did nothing to assist me in obtaining the New York specific

legal materials that Indiana authorities did not have. Nor did he direct me on how to obtain them. Things I desperately needed to put in a pro se appellate brief.

20. I informed him about several leads that I had about Taju Halbert, and how he may have gotten several deals in his favor that we did not know about at trial, and he nothing to try to obtain this information[2].

21. Our client-attorney relationship became so negative that I had to turn to the Second Department's Grievance Committee. As a result, they informed him to cooperate, something that he promised that he would do. But he did not.

22. Then he did the unthinkable. He put in an appellate brief that did not raise the strongest issues, and failed to give me an opportunity to participate in its formulation.

E. Appellate Counsel's Boilerplate Appellate Brief

23. On 12/19/99, appellate counsel filed an 8 point brief, raising the following issues:

Point 1. The Court Should Have Granted The Petitioner's Motion For A Mistrial Based Upon Prosecutorial Misconduct

Point 2. The Trial Judge Ruled Incorrectly On Defense Counsel's Repeated And Continuing Requets For Sanctions And A Mistrial Due To The Prosecution's Rosario Violations

---

[2] On information and belief, and based on information provided to me from friends and family, Taju Halbert received additional monies from the District Attorney for living expenses during the trial. This was not reported to the defense.

7

Point 3.     The Charge On Circumstantial Evidence Was Fatally Deficient Depsite Defense Counsel's Request

Point 4.     The Court Erred In Denying Challenges Of Prospective Jurors For Cause

Point 5.     The Court Erred In Permitting Doctor Quinlan To Testify Concerning Statements Made By The Petitioner In Violation Of The Doctor-Patient Privilege

Point 6.     The Case Against The Petitioner Was Entirely Circumstantial And The Testimony Of Taju Halbert Was Not Corroborated And Should Have Been Strcken Or Not Permitted At All

Point 7.     The Parole Officer's Testimony Was Completely Prejudicial And Should Not Have Been Permitted

24.    But as Mr. Joel Rudin would latter comment, this brief was boilerplate, and quite frankly "awful" (see Exhibit B).

25.    On 04/02/02, the Appellate Division, Second Department, denied my appeal (see People v. Wallace, 293 AD2d 556 [2nd Dept. 2002]). On 08/29/02, the Court of Appeals denied leave (see People v. Wallace, 98 NY2d 714 [2002]).

26.    For the next 8 years, I tried to obtain from various agencies assistance in obtaining the appropriate protocols to advance several constitutional claims in New York State. But I never got the legal materials. I was never able to obtain the protocols. I was lost. I didn't know how to file a CPL § motion without running afoul of its presentation protocols. Nor did I have the transcripts to prepare a coram nobis application.

8

F.      To The Rescue: Mr. Joel Rudin

27.     Between June 24, 2010 and October 29, 2010, my family contacted and retained the services of Mr. Joel B. Rudin (see Exhibit A). This occurred prior to my return to New York State.

28.     Almost immediately, Mr. Rudin (and his partner Mr. Ben Fishman) recognized several errors by my appellate and trial counsel. In fact, Mr. Rudin stated that he believed that my "appellate attorney did an awful job" (see Exhibit B, page 2), and that it appeared to him that he "basically took a few issues from the trial without much thought and plugged them into what appears to be stock legal argument from other briefs or appeals" (id.). He also found that there was no thought or strategy behind what he did, and advised me that I may have a viable coram nobis petition (see Exhibit B, page 2).

29.     Mr. Rudin identified 8 issues which were stronger than those which were raised in my appellate counsel's brief. Those being:

Point 1.    The insufficient evidence that I possessed or shot the 9 mm gun during the crime in light of the cooperating co-defendant's testimony that I said I had given that gun to my (alleged) accomplice, and;

Point 2.    Whether the evidence of an intent to murder Police Officer Martin was insufficient considering there was not any testimony, as far as Rudin could tell, that the shots were fired in Officer Martin's direction, and;

Point 3.    Limitation on defense cross-examination of my cousin Mr. Smith, including the court's ruling permitting him to take the "fifth" and not answer questions about his involvement in a robbery, while not striking his testimony, and;

9

Point 4.	Co-counsel's elicitation of information damaging to me during his cross-examination of Halbert, and the denial of my trial lawyer's pretrial motion for severance in anticipation of this problem, and;

Point 5.	The prosecutor's repeated delays in disclosing discovery and <u>Rosario</u> material, which prejudiced the defense, and;

Point 6.	The denial of my trial attorney's request for the personnel record of Detective Robert Bock when it turned out he had real disciplinary issues and his testimony concerning my alleged statement was being disputed, and;

Point 7.	The denial of my trial counsel's mistrial motion when the prosecutor made an issue of my initial refusal to give a blood sample on the advice of my attorney, which also made it possibly necessary to testify as witnesses, which they could not do while acting as attorneys on the same case, and;

Point 8.	The prosecutor's improper remarks in summation, including his false claims that the blood evidence showed the blood definitely was mine, when in fact it did not show that; and his false claim that Halbert testified that I possessed the 9 mm gun, when in fact Halbert testified that I said my accomplice had it.

(see Exhibit B, pages 2-3).

30.	While each of these issues are strong, there is one that is the strongest. That is the prosecutor's false claim that I had the 9 mm gun at the time of the shooting.

31.	As explained in Point 2 of the attached Memorandum of Law, according to Halbert, I did not use the 9 mm gun during the robbery. Halbert stated, both at trial and in his prior statements, that while the 9 mm gun <u>belonged</u> to me, and that I had brought the gun to the robbery. Also he testified that when he visited me in the hospital, I told him that me and Devorce had switched guns, and that Devorce, and not me, had the 9 mm gun (TT 2408-2417).

10

32.     Also, in an August 26th, 1996 report prepared by investigating Detective Bock, Halbert is quoted as saying that, while he and Devorce were in the car together right after the robbery, Devorce told him that I had been shot by Khouri (aka "Red")(p.5). Halbert then said that when he visited me at the hospital, I told him that I had the .38, but that Khouri had the 9 mm, and fired it at the officer who came to the back door, and also fired the shot that hit me in the hand (pp. 7-8).

33.     Furthermore, Halbert said that when he encountered Khouri later the same day, Khouri told him that he, Khouri, had been the one to discard the 9 mm (p.8). This was also repeated in Halbert's grand jury testimony.

34.     These facts prove that not only I am actually innocent of all charges associated with the firing of the 9 mm, but that Halbert's testimony that I had possession of the .38 provides for an un-indicted crime for which I was never given notice, and very well may have affected the jury's verdict.

35.     I need not tell this Court how excited I was to discover these issues (see Exhibits B and C). An excitement that was quickly dampened by the harsh realities of finishing the CPL § 440.10 and Coram Nobis applications Mr. Rudin said I needed (see Exhibit B).

36.     Indeed, after paying about $40,000 in fees to research my case, my family simply did not have the additional $20,000 - $25,000 per motion that Mr. Rudin required (see Exhibit C).

37.     As such, Mr. Rudin, on February 29, 2012, informed me that he would be ready to help me when me and my family were ready. In other words, when me and my family had the money he requested (an additional $20,000 - $25,000 for each motion).

38.     But we didn't have the money.

## II.     REQUEST FOR STAY AND ABEYANCE

For the sake of economy, the facts, law and arguments needed to support this argument are found in the attached Memorandum of Law at Point 2.

## III.     TIMELINESS OF APPLICATION

For the sake of economy, the facts, law and arguments needed to support this argument are found in the attached Memorandum of Law at Point 1.

## CONCLUSION

For the reasons advanced above and in the attached Memorandum of Law, I pray that this application be granted, and for any other and further relief as to this Court may deem just and proper.

Respectfully submitted,

Raymond Wallace

Sworn to before me this

29 day of May, 2013

NOTARY PUBLIC

Harry D. Durgan
Notary Public, State of New York
No. 01DU6008379
Qualified in Clinton County
Commission Expires 6/21/14

13

## AFFIDAVIT OF SERVICE

State of New York)
County of Clinton ) ss.:

I, Raymond Wallace, being duly sworn, do state under the penalty of perjury that on the 29 day of May, 2013, I did give an officer at Clinton Correctional Facility the designated copies of the attached Application for Habeas Relief, to be duly carried to the following parties:

Original And Copy

United States District Court
Southern District
500 Pearl Street
NYC, New York 10007

Sworn to before me this

29 day of May, 2013

_____
NOTARY PUBLIC

Harry D. Durgan
Notary Public, State of New York
No. 01DU6008379
Qualified in Clinton County
Commission Expires 6/20/14

Respectfully submitted,

Ray Wallace
_____
Raymond Wallace

